All right, the first case we'll hear this morning is D.A. Realestate Investment v. City of Norfolk, and Mr. Sherman, we'll hear from you. May it please the Court, Judge Niemeyer, Judge Thacker, Judge Quattlebaum, Joe Sherman on behalf of D.A. Realestate Investment, LLC, and its single and sole member, Mr. Danny Fox, who traveled from his final duty station in Alaska to be with us here today after 27 years of honorable military service to the United States Navy. The private property rights are the guardian of all civil liberties. Without the right to own the church, the right to worship is worth little. Without owning the gun, the right to bear it means not much, and without the right to own your own home, the right to prevent quartering of soldiers in peacetime or unreasonable searches and seizures wouldn't mean much either. And so in this case, we've got a Fifth Amendment takings where the record bears out that it's a rather easy case. The city intentionally took the property, they physically destroyed the property, and there was no exigency, there was no urgency. The city's corporate representative, pages 530 and 533 of the record, express that they elected to take the property intentionally without an imminent need or threat of harm to the public. And so But with notice to appellant? No, Your Honor, the notices don't bear out either. The record citations on the notices demonstrate that this is the constitutional corner cutting that Justice Holmes contemplated in 1922. Did the appellant not contact the Norfolk City inspector in May of 2018? He did from overseas, and he said that And why was that? Just out of the blue, or did he have notice of something that caused him to call? My understanding is that a property manager, a local property manager, expressed that a car had hit the house, which caused some damage to the brick stairs on the exterior, and so they all got in contact. And so the city's got That's why he came home, and he was working at the site. He said that he was working fixing the accident. He was there two weeks. While he was working there in the site, his notices had been postponed. He called, telephone called, and emailed, and said what he was going to do, and they said send us a schedule. He never followed up. Right, and so the Well, I'm just addressing the notice, and that's totally contrary to what you said. This was after he came back home, and he testified in detail to the fact that he was working at the site for a couple of weeks, mowing the lawn. Sure. Why sure? You just answered that he was overseas when he got notice. Well, and he did come home, and the record is exactly what you say, that there was some correspondence in May and April of 2018, and I think that none of that doesn't change the constitutional corner-cutting of Now, wait, let's take the first question was whether he had notice, and you took issue with that. I do, because I don't Well, now we know that he did have notice. May I clarify? He didn't have actual notice that the city intended to demolish the property. It said so right in the notice. It said explicitly, use the word demolish, and then they followed in the, that was pursuant to a local ordinance. No, your honor, the June 2018 is the only notice that used the word demolish, and that by the record was never served as the building code requires. It was never posted. It wasn't posted? No, your honor, it was not, the postings, the only postings in the record are The only postings that were in some of the pictures, what did they say? That was apparently posting the 2017 letter, which didn't have the language about demolishing the property, only that he would be subject to fines and summons and criminal sanction. If your honors could take note of footnote six in the briefing at 1095 of the record, the briefing of 1086 to 1096 best explains the issue that you're talking about most, which is the notices, and it demonstrates that the letter that was posted in the corporate deposition, we went through that exercise and the city representative agreed that the letter that is, right, and neither one of them could be the letter that mentioned demolition because it had six paragraphs, not seven. So she couldn't tell exactly what was, no, your honor, he made, he made, he made, he made the repairs, the record bears out on, he wrote a letter saying a long list of repairs he was going to do, and they said provide us a schedule. None of which were about the imminent threat of harm to anybody. The issue, the question, we're talking about notice, why don't we stick with what we're talking about? Well, and I want to talk about the same thing you want to talk about, I just think that there's, there's degrees of notice. Was he aware that the property couldn't be rented? Yes. Was he aware that it was subject to demolition? No. He knew it was violating the code, didn't he? He knew that it was not up to building code. Yes. It was violating the code. Right. Right. And do you have a copy of the building code in front of you? No, your honor. It's in the, it's in the record here somewhere, I just can't locate it. The very first provision of the building code says that property that is uncomplied can be demolished. Right. Pursuant to the code. So 105 of the building code says that if you're going to. That's what they followed. They followed the building code. They didn't follow it. That's the, that's the corner cutting. Tell me what they didn't follow. The building code requires that they personally serve the owner and that if they can't personally serve the owner, that they send certified mail and post it. And so. They did both those, right? I don't think so. No, your honor. There's no, there's no evidence. And they admitted that they did not certify mail the 2018, which is the only notice that indicated demolition. And there's also no post. There's no picture of any posting. Let me ask you. He had a, he had a box, a mailbox that he maintained. Right. All of this went to that mailbox, presumably because it was addressed to that mailbox. Did he open that mailbox ever? I, I think that the record details some collection of mail when he came and went from. But the, but the problem is that when they send certified mail to a PO box, it's rejected. It's not ever deposited in the mailbox. It's the corporation, not as the individual. I don't think. There were two notices, right? Right. Neither of which were in 2018. Right. I'm not arguing that. I'm saying there were two notices. One dealt with the entity and one dealt with the individual.  In 2016, December 2016, there was identical notices sent one to the entity, one to the individual. Neither of which mentioned demolition. And the entity came back and the individual did not come back. Maybe so, Your Honor. And, and, and. I just think, you know, we ought to be able to agree on the record before we talk about the legal issues. And we just can't play fast and loose with this. It looks to me, I looked at this fairly closely, it looks to me, he had notice that his house was a serious problem. It violated code. There were some pictures of wires hanging down. There was all kinds of discrepancies about it. He was mowing the lawn there regularly. He said he was there for two weeks making repairs or trying to work on it because of the car accident. And come back and say he never got any notice or he was overseas. Or this notice didn't contain sufficient information. The code provides, and he's imputed with the knowledge of the code, violations can be cured by demolishing the house. Well, I, I, I think that you're right about a lot of this. We're conflating two years into a colloquy. And the 2016 notice that wasn't returned to sender says that you can't rent the place. You can't. Are you suggesting he didn't have notice? I'm suggesting that the 2018 letter, the only letter that mentioned demolition. My question to you is, are you suggesting he didn't have notice? Your Honor, I'm suggesting that he did not have notice. They intended to demolish the structure. You don't have to answer my question, yes or no. Did he have notice? Not of demolishing the structure. No. The 2016 letters, not. His code says he, that provides him notice. That's the statute. My question is, did he have notice that the, his place wasn't up to snuff and that they kept notifying him about that? I think that he knew the place was not habitable. I know he knew the place was not habitable. He did not know that they intended to demolish it. And they didn't serve him, send a certified letter for 2018 or, and, and ultimately I think that the. Nonetheless, you, you argue that this whole thing, demolishing the property was some pretext on the part of the government or the state to, to increase its tax base or its tax revenue. Is that right? Well, yes. The, the city of Norfolk is out of land. It's an old municipality and a third of its revenue is from the tax base. What's your best record evidence of pretext or that they did this in order to increase the tax base? Well, the, the briefing at 1086 and 1096 includes a footnote, I think it's three, that mentioned. The J.A. at 1086 and 1096, which is your reply brief? Yes, Your Honor. The, the magistrate judge compelled discovery a week before the summary judgment briefs were due. And it was at that hearing that they ordered the city to provide evidence of how this scheme works in that all of the demolitions over the last five years in order to compare. So I think that what I want to say on the record is that everybody agrees they demolished for nuisance abatement. My argument, and I think the ultimate reality, is that they were doing two birds with one stone. They have an overzealous building code enforcement because it helps them gentrify, redevelop churned land.  And where is your evidence of that? Well, I don't have strong evidence in the record. I've got the discovery compelled by the magistrate judge a week before summary judgment briefing was due. So I think that the material fact in dispute is the condition of the property, the compensation owed for what they admit is an intentional demolition of private property. You know, you jump past this code, I've got the code now here, it's at 972. And it said, notwithstanding the above, this is the idea that they can try to remedy. They said the unsafe structure, that it's unsafe or a structure unfit for human occupancy constitutes such a hazard. It should be raised or removed. Then the code official shall be permitted to order the demolition of such structures. This is the code they have functioned under. And doesn't it go on to say in accordance with section 105 and 106? The whole code is applicable. And I think that's right. My point is, they were functioning under the code. Now you haven't challenged the code as unconstitutional. So the question is, isn't this just a simple case of whether the Norfolk followed the code? I don't think so. I think that if they follow the code, it's a regulatory taking, whether or not the regulation infringes. You have to challenge it because this is just a normal exercise of police power. And I don't think there's a per se exemption for police power from the taking this clause. That's the Yawn case from this circuit. Then this is unconstitutional and you haven't raised a challenge to the code, have you? I think that if it was properly regulated, then that would be a regulatory challenge. They didn't follow the code. They just did it. They just did it. They didn't give the notices required by the code. So he couldn't properly defend himself. There's no evidence they sent the 2018 letter at all or posted it at all. All the postings predate the actual letter that says demolition. In fact, it looks like from their own depositions that they- Like it just happened overnight without any notice or ability for an appellant to do anything about it. This started, the first notices were mailed December of 2016 and it wasn't demolished until December of 2018. That's two years. And I understand you're going to tell me he didn't know any of these notices, he didn't see any of these notices, but it didn't just happen like that. No ma'am. Two years worth of this. Absolutely. However, the 2016 notice says you have to secure the property and you can't rent it. And he said, great, I don't want to rent it, I'm overseas. So he secured the property. He had a notice in December 2016, he saw that one. That he had to secure the property. As we know, he saw the one in May of 2018. I think that the May of 2018 posted the letters of 2017. I think the details that are causing some disruption between us is what he had notice of. At no point did he have notice they were going to demolish the property. The letter they generated in 2018. What did they say in the letters, the essence, a fair statement of what did they say in the letter in May? In June, they said. You said he got a letter in May. Right. The fair essence of the letter was your property is not up to code, enclosure of the violations and you have to remedy them by date blank. It had a blank. The enclosure didn't have a date listed. It didn't mention the word demolition. Not once. And if they want to proceed according to the code, then they should give the notices required by code, follow the code, and then it's a different case. How was the June letter sent? Wasn't sent at all. Wasn't sent at all. Do you mean they just kept it in their file? Right. They generated it in their file so that their file could process a demolition. It was not served. It was not posted. It was not sent at all. That June 2018 letter, the only one that mentions demolition, it said if you don't remedy, then we will demolish. And in accordance with 105 and 106, which requires personal service, and if no personal service, then posting in certified mail. Counsel, just to, I guess, frame the issue, you dispute notice. If we disagree about notice, and I'm not saying we are, but just hypothetically, then the due process issue has statute of limitations problems, correct? Right. And I know you challenge that. But if you have statute of limitations problems for the constitutional claims, then we're left with the state inverse condemnation action, right?  Is the primary issue you're asserting there the issue you and Judge Thacker went back and forth on in terms of pretext? I think that the Yawn case from this circuit best describes the situation, whether or not the taking was foreseeable, intentional. And so I think because it was intentional and foreseeable, that at the jury trial, we should be able to argue that they demolished because of a nuisance. However, this isn't a police power of an imminent threat. That's a pretext to doing what they want to do, which is redevelop the neighborhood. Yeah, I'm not, I think I understand your argument there, but do you need evidence of pretext to get past summary judgment on that? No, Your Honor, because the summary judgment, there's no dispute that they intentionally took the property. It was foreseeable that demolishing the property would confiscate the real estate. And they did it without an exigency. Does abatement for a public nuisance require there to be like some immediate exigency? Can't they abate a public nuisance under Virginia law? So I think that the, yes, they can abate according to the regulation. They didn't follow the regulation on notices. It's a procedural issue, and I understand your arguments about that. Right. I think that they can, at the risk of paying compensation for their confiscation, because they've directly, physically taken the property without . . . They have to pay compensation for nuisance abatement, correct? I disagree with that. I think that's the point of the Yawn case, which talks about is a per se exception for the police power. And the holding, quoting the Supreme Court, says it's axiomatic in the jurisprudence that it's not a per se violation. I think that is the problem with the Catch-22 on the false premise, that there's a per se exception for the police power. If the per se exception exists, it needs to be an immediate threat. I don't think it's an exception. I think it's different in kind. In other words, to exercise the police power and abate property that may be dangerous, uninhabitable, a nuisance, whatever standard you apply to it, you're exercising the police power to get rid of the . . . in favor of the public safety. And so it seems to me that when the state does that, that's not a compensable act. That's a legitimate exercise of police power that we've had since the beginning. I agree. If it's a public exigency, which they've admitted in this case it's not. I think you do. I think you do. Do you think the authority that you need in an exigency is what case? I think that the Yawn case best puts forward the theory of the world on the difference between a tort and a taking. And I think that a proper exercise of the police power is . . . goes back to Pennsylvania Coal 1922, where he says, if you go too far. And so that line . . . I mean, we're talking about . . . this developed over time, and there's an increasing deterioration. And the question is, isn't it legitimate? Is there anything that restricts the police power to something that's just about to fall? In other words, you said . . . That's the exigency, just about to fall. Where does that come from? No, I said is that . . . what's the case that limits police power to that? The . . . I'll read from the Yawn case, and I will point you to my reply brief, which cites authority on exigency being the requirement in order to exercise police power without compensation. And even the Virginia case is cited by both sides. You show that the nuisances where they summarily take property without compensation are infected cattle, infected trees, where the property has no value because it is diseased. And so, I'd like to reserve a little bit of time for rebuttal, and I'll read to you from Yawn when I come back. Okay, thank you. All right. Mr. Melita? May it please the Court. My name is Adam Melita, and I represent the City of Norfolk, the appellee in this matter. This is a case where judgment was awarded to the defendant because the plaintiff failed to file his constitutional claims within the statute of limitations. They came a year too late. The appellant's panic that the district court ruling effectively grants the city license to demolish homes after it, one, sends a notice that fails to reach the owner, and two, waits 14 days for an appeal that it knows the owner is not aware of, is a complete fabrication. The district court ruling does nothing of the sort. The district court did not state that such deprivations of property are categorically allowed. A plaintiff with those facts can bring his case and can seek redress for being deprived of property without adequate notice. But he has to do that within two years. Can you give us the specific evidence that you say creates notice that triggers the statute of limitations? Your colleague says they didn't have notice. There may have been some letters, but they didn't suggest demolition. What's your response to that? The statute of limitations begins to run not at the time the notice is given, but at the time the injury is sustained. And in this case, the statute of limitations would have run when Mr. Fox, the agent for DA Real Estate, knew or had reason to know that his property had been demolished. The record makes clear that he became aware of that later in December of the year the property was demolished. I think it was 2018. And by the early winter months of 2019, he was in communications with the city of Norfolk with a FOIA request trying to understand what happened to his property. When was the suit filed again? The suit was filed in December of 2021. And so it's a year too late. His property was demolished in December of 2018? Correct. He knew for three years, or thereabout two years, 11 months at the time this case was filed, that his property had been demolished. And that's why he's late. Regardless of whether the notices were sufficient or not, the property was demolished in December of 2018? That's correct. And so he was on the clock from when he became aware of it, as the record indicates, in December of 2018. He said Thanksgiving, around Thanksgiving, was when he became aware of it. No, he was on Thanksgiving, I think, a holiday or something. Correct. Correct. And he did say before the end of the year. It was demolished on the 13th, and he came to it. Correct. And so that's when the clock started to run. And so I'm a little bewildered that DA Real Estate is complaining about notice or arguing that there wasn't adequate notice, because the notice question, as I understand it, is not here on appeal. I've looked at the docketing statement. I've looked at the decision of the district court that said that the Fifth Amendment case came too late. It's subject to the personal injury two-year statute of limitations in Virginia. And so none of those issues are represented in the docketing statement. What I understand to be the issue today, what's represented in the docketing statement, is whether or not the inverse condemnation claim, the claim brought under the Virginia Constitution and the Virginia statute, 8.01-187, was properly resolved in favor of the city. Can I ask you a question about that? We have the issue of the inverse condemnation under state law and the issue of abatement of a public nuisance. Is the city's position that if you were to exercise eminent domain or make an inverse condemnation claim based on eliminating blight, that is a public nuisance, is that public use under the eminent domain statute the same as a public nuisance that allows for abatement? We believe that it is. The definition that the Virginia General Assembly has adopted for a blighted building, for blight abatement, one of the authorized public uses for which government can take private property, says, I think it has more than one component, but the very first component is that it has to be a public nuisance. So if the city were coming in the front door, filing a condemnation petition and asking for the court to grant it title to the property through the condemnation route, it would have to prove that the property was blighted, that it was a public nuisance. Public nuisance there is the same as the public nuisance that permits abatement? We believe it is. It's under the police power. I know that's not what happened here, but the city could exercise its eminent domain rights for the same public nuisance or abate. At its election, the difference being in the former, you have to pay fair compensation and you get title, and in the latter, you don't get title and don't pay compensation? You almost have it correctly. I would argue that in neither case do you have to pay compensation. The first one, if you're asking for condemnation for blight, you are asking for title. So you want to clear the nuisance and then take title. In the latter, where it's just straight nuisance abatement, just a straight exercise of the police power, you might be removing the nuisance, abating the blight, but you're not asking for title. But neither of those are compensable. Is the point you don't pay compensation in the first scenario because it's not worth anything? Because normally in an eminent domain, you do pay fair compensation, right? Right. Normally you do, but the principles in Virginia, the cases that you all had a colloquy with Mr. Sherman about, state that property that is a nuisance, that the owner has no right in their bundle of sticks to operate. Nobody has a right. That's in the abatement discussion, isn't it? The former case, right? And the Stickley case. But because a blighted property has to be proven to be a public nuisance, you still have to meet those same standards under Virginia law. So you still have to demonstrate that the property is unsafe and a danger to others. So that's going to categorically rule you out of any compensability. I don't know that we need to agree or disagree on that. I'm not sure. I didn't necessarily read it that way. But I don't think that issue needs to be resolved in this appeal, does it? I don't believe it does either. And similarly, I don't believe there's any issue in Yon that pertains to anything that's on appeal in this case. You'll recall from the facts of the Yon case that the county was spraying for mosquitoes and the allegation of the plaintiffs was that in doing so, the county had killed their honeybee population. And so the question that the court of appeals resolves in Yon says, no, there is no categorical exemption from just compensation just because the county was exercising its police power spraying for mosquitoes. That may be true. But just because there's no categorical exemption does not mean there's still not an exemption for nuisance abatement. So if you just change the hypothetical in Yon a little bit, you'll understand why. If the plaintiffs were not raising honeybees but were raising mosquitoes and were investigating eastern equine encephalitis or Zika virus and the county came and sprayed for mosquitoes and killed their mosquitoes, that would have been a nuisance abatement. And nobody would have a right to run a mosquito farm. And the fact that Yon comes out the way it comes out and why the categorical exemption is rejected is because the Yon's honeybees were not a nuisance. If the city was abating a nuisance that the Yon's were maintaining, we wouldn't be worried about the holding in that case. If the city hypothetically were to abate as a pretext that there was no public nuisance just to do it completely wrongfully, does Mr. Fox or his LLC have rights that they could have pursued? Absolutely. What are those options that could be pursued? I know there's statute. Forget statute of limitations, but assume you do it all timely, what are your options? That's a due process claim. It could have been under the U.S. Constitution. It could have been under the state constitution. But it's clearly a due process claim. Is there a tort claim perhaps? Is there a tort? The problem with the tort claim is you could bring a tort claim. There may be principles of sovereign immunity that might interfere with tort liability, but you may have a tort claim, at least colorably. But I do think the express answer to your question is provided by the U.S. Supreme Court in the Chicago B&Q Railway case that's cited in Yon. It's described in Yon. And that case clearly says, the constitutional requoting, the constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If in its execution of any power, no matter what it is, the government, federal or state, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner. If the means employed have no real substantial relation to public objects, which governments may legally accomplish, there's the question. If it's an illegal taking. If they are arbitrary and unreasonable beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of property rights injuriously affected by illegal action. And so right there, the Supreme Court is saying, your claim is a due process claim. That's what due process ensures. And so that's the claim that Mr. Fox could have brought had he done so timely, based on the record. I'd like to spend a little bit of time. Yes, sir. I'm a little puzzled by the notion that a nuisance and blight are the same. I sort of understood, and maybe the cases don't agree with this, but I sort of understood blight is the economic level of a neighborhood that is lowered and maybe for all kinds of reasons. The houses are dilapidated. There are rats in the area. Half the houses are unoccupied. And the government comes in and wants to take the property to improve it with new housing or a park or whatever, and they take title to the property. Whereas a nuisance is an immediate, here in this case, the words are what? Unsafe, uninhabitable condition. Unsafe, uninhabitable, which isn't necessarily, it's a worse condition than a blight. Blight is just a reduction of the value of a whole neighborhood or even of a house, but it's not painted, it's not kept up, and it's a blight to the neighborhood. But a nuisance, I mean, uninhabitable and unsafe, it seems to me, is a more central police power that can be exercised. I would respond that your comprehension of the jurisprudence is generally accurate. I do believe that Virginia has been more specific and more rigorous in its definition of blight than the general jurisprudence. I think that's all a consequence of the measures that were taken by the General Assembly post-Kelo to clamp down on what this particular Commonwealth legislature determined to be an eminent domain abuse that occurred in Connecticut. I had the same initial reaction as Judge Niemeyer, but I think if that were right, then the issue of whether there was a nuisance would be potentially material. In other words, district court said whether there's a nuisance or not is not material, because if there's a nuisance, you can abate, and if there's not a nuisance, you don't have a public use. That would have been the principle, but I think the district court does a thorough job of identifying, in the definition of a blighted property right there in 1-219.1, that because one of the necessary elements, I think it's the first of three elements that have to be proven for a property to be deemed blighted and therefore eligible as a public use for which it can be taken, is that the property itself has to constitute a public nuisance. So that the property down the street, the barbershop that's in perfectly good condition... It would be a narrower constriction than Kelo, where it was... Exactly. And by narrowing it, they essentially trued up and made coincident the definition of a nuisance. So whether or not blight and nuisance might, in a generic sense, be different, under Virginia statutory law, they've equated them now, post-Kelo. Correct. That is what the district court held, and I believe that is consistent with what the law says. Judge, because it's an issue on your honors, because it's an issue in the briefs, I'd like to spend just a few minutes on the issue of Darby. This was the later identified authority that was submitted by the appellant, the 2024 case, which I don't believe breaks any new ground. Darby is the case. It arises from the federal government's prohibition against certain evictions. And it's a case that the appellant relies on for the principle that illegal takings can sometimes still result in a right to compensation for the property owner. You'll recall from our briefing, and you might intuit from the district court's opinion, that any illegal act automatically precludes the property owner from being eligible for just compensation. And Darby says that's not the case. The problem with relying on Darby is that Darby doesn't apply for four reasons. First of all, Darby is a Fifth Amendment case. It's a Tucker Act case. The two cases it relies upon, Darby does not plow any new ground. It relies on the Del Rio drilling case and the Ramirez case, and just says we're doing the same thing we did in those other cases from, I think, 1998 and 1987. But those are all Tucker Act Fifth Amendment cases. And as the court is already aware, the Fifth Amendment case was untimely and was dismissed for being too late. The second reason why Darby doesn't apply is because, first of all, it's a Fifth Amendment case and they don't have Fifth Amendment claims. Second of all, the Fifth Amendment claim that Mr. Fox did have was dismissed for being too late. The third reason why Darby does not apply is that Darby recognizes that there are exceptions to the rule that says even an illegal act, so long as it's authorized, can result in an opportunity for the property owner to realize compensation. And the exceptions to the Darby rule are where the legislature has expressly said, no, you do not have authority to acquire private property for public uses in specific instances. Darby analyzes three specific examples. It analyzes a taking of property in Southern California by, I think, a March Air Force base in the Southern California financial case from 1980. It analyzes the Huey versus U.S. 1910 case where the Civil Service Commission was occupying more floors than it had rented in a building and the landlord wanted to be compensated for the additional floors, I think the basement, that the Civil Service Commission had occupied. And then it analyzed the North American transportation case from 1920 where General Randall of the U.S. Army had taken property for military purposes in Alaska that he was not authorized to take. And in all of those cases, Darby says, the legislature has expressly precluded these people, these entities, from having the authority to take property. And so there is no just compensation for the owners in all of these cases. And that's exactly the situation we have in the instant case. Virginia's General Assembly has expressly told localities that they cannot take property to increase the tax base. They cannot take property for economic development. And so even if you were to apply the Darby Rule in Virginia, which Virginia has never done, there is an express exemption, I'm sorry, an express exclusion from the authority of localities to take property to increase the tax base. So any apparent authority to take for that purpose has been excluded and therefore falls within the exception cases, much like Marsh Air Force Base, General Randall, and the Civil Service Commission, and really does not fit within Darby. And the last reason why Darby does not apply is that the Virginia Supreme Court has expressly rejected any rule that even looks like Darby. In State Highway and Transportation Commissioner v. Linear Farm from 1987, the Virginia Supreme Court wrote, quote, we have consistently adhered to the view that the eminent domain provisions in the Virginia Constitution have no application to tortuous or unlawful conduct. And then even more clearly in 1954, Erickson v. Anderson, Neither the Virginia Constitution nor the state statute, quote, has any application to unlawful or negligent acts of the servants, agents, or employees of the State Highway Commission, which may result in damage to a property owner. There is no state statute which authorizes the officers or agents of the state to commit wrongful acts. On the contrary, they are under the legal obligation and duty to confine their acts to those which they are authorized to perform by law. And here's the most important sentence. If they exceed their authority or violate their duty, they act at their own risk, and the state is not responsible therefore. So the Virginia Supreme Court has rejected the Darby concept. And what DA Real Estate is asking you for today is to allow them to bring a due process claim, a claim that they had to bring within two years, allow them to bring that within three years, relabel it as an inverse condemnation claim, and then adopt a Darby rule and expressly overrule the Virginia Supreme Court, all within the context exclusively of the Virginia Constitution and the Virginia statute. There are no federal constitutional issues left. They're asking you to rewrite Virginia law. Thank you. Thank you. I went over my time before, and so I'd like the opportunity to just explain that if the theory of the whole case as they fit in because I think a lot of jumping around isn't serving our interest into the holistic view. If they had taken the case with straight condemnation, they could file a petition, and then we could raise an affirmative defense and say it's not a nuisance, it's not a blight, you're not allowed to take it. We could enjoin the take, or we could submit to it and get it to a jury verdict. Instead, they've gone straight to abatement, so there's no structure to evaluate to determine how bad a shape it's in. There's no defense to say don't do it. It's already done, and all we're asking for is a verdict. We're asking for the opportunity to put on compensation because nuisance is material to whether or not that structure had any value. And nuisance is defined by the Virginia Code as a menace to society. Blight is defined by 1-219.1 as unsafe and either a nuisance or uninhabitable. So your position is you disagree that the reference to public nuisance in the statute in defining blight is the same as nuisance for abatement purposes? It's very close. I don't think it controls the outcome here. I think what controls the outcome is that they've gone ahead and done the abatement, so we can't enjoin it. We can't say it's not done right. And since they didn't follow the building code regulation as to properly provide notices and personal service, if a sheriff serves you something, that's serious. And so the only option we've got is coming to court on an inverse condemnation. Why couldn't you bring a due process claim? If they abated your property, it was brand new with no problems, and they said it was a nuisance and you abated it. Why couldn't you bring a due process taking claim?  You clearly have that right. Well, maybe. The city site's precedence of this court, Yates in 1986 and Presley in 2006, to say that your process is post-death probation inverse condemnation. All roads lead to Darby in this case because Darby says exactly what needs to be said here, which is that if there's not a Fifth Amendment remedy, if there's not an inverse condemnation, there's no meaningful remedy at all because what they did is take the property. And so in 52-53 of the record, 1071 through 1073 of the record, the city cites two precedents of this court. The Virginia Supreme Court and the city v. Lee has not expressly adopted it but not outright ejected it either. So their argument and persuasively arguing as recently as an unpublished decision from the Court of Appeals Virginia State Court this year is that your process is inverse condemnation. And so they're abating. The people with the least amount of resources, connections, and education are the ones that are most hurt by this because they're not going to spend $60,000 to sue the government for this kind of colloquy and to debate whether or not it was a nuisance when there's no building to even look at. So what's fascinating about this case and why it's the right case to bring to your Honor's attention is because the corporate designation, they say it was not unsafe. It was not a threat to public health safety. That's plain as day in the corporate designation binding on the city. 530 and 533, they say it wasn't a threat to anybody. As long as nobody's living there, it's not a threat. And so nuisance is a material fact and dispute, and that's what should go to the jury because the only issue left to resolve is what it was worth. If they clearly took it, they intentionally took it, which is what YON stands for, is whether or not the taking was foreseeable. And the line between a tort and a taking is did they intend to do it or was it negligence? Was it some sort of rogue actor? And so nuisance is material, and it relates to value. That's all that's left to decide. YON rejects a per se police power exception. I'll quote, that government actions taken pursuant to the police power are not per se exempt from the takings clause as axiomatic in the Supreme Court's jurisprudence. Citing Arkansas Fish and Game, Supreme Court, 2012, the court has consistently rejected this argument when deployed to urge blanket exemptions from the Fifth Amendment's instruction. And then citing Lucas, which was a 1992 Supreme Court case, quoting Lucas, if instead the uses of private property were subject to unbridled, uncompensated qualification under the police power, the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared. So it goes on to talk about the legitimate exercise of governmental powers and the degree which the invasion is intended or foreseeable. So I think that the notice issue does bear some impact in that if they had properly followed the regulations set forth by the building code and the state law, then this is not the same case. Because in 2016 they're saying, look, you can't rent it in its condition. In 2017 they said, somebody's broken into it. It's got to be secured. At no point in the communications in April or May 2023 did they talk about knocking it down. And then the June letter that they never sent, never served, never posted said demolition, but it only stayed in their file. Nobody got it until we did discovery in this case. So the Yawn analysis talks about how the press releases related to the bees would impact the foreseeability. And I think that's where the notices matter, because if he had true notice that it was subject to demolition, then it's a different case. He didn't. The 2016 notice says don't rent it. The 2017 says make sure it's secure. Somebody's broken into it. And not until 2018 did they put the word in their file, although they never told him. So I think that the language about necessity is quoted by my colleague, and that's what the problem is here is that the validity of a police regulation depend on the circumstances of each case and the character to the regulation, whether arbitrary or reasonable, and whether designed to accomplish a legitimate public purpose. If the means employed have no real relation to the public objects which government may legally accomplish, if they're arbitrary and unreasonable, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected. And so that's the Pennsylvania coal case, the seminal case that property may be regulated. If it goes too far, it's recognized as a taking. Penn Central, 1978, a use restriction may constitute a taking, if not reasonably necessary, of a substantial public purpose or perhaps has an unduly harsh impact on the use of property. And so that's, I think, the material issue here, and I think that's what the jury's got to decide, and I think that's what the McIver case from 2020 of this circuit also held true is that nuisances are best decided by a local jury because there's an ebb and flow of use of the property compared with the needs of the public. And what better than the folks who are local to South Norfolk to understand that, yes, a property may get broken into and requires securing. However, that doesn't mean that it was going to fall down. They said themselves it's not going to fall down. I'm sorry, Your Honor. Thank you for your argument. We'll come down and greet counsel and then proceed on to the next case. Thank you, Your Honor.
judges: Paul V. Niemeyer, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.